UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
─────────────────────────────────
                                )
JOHN DOE AND JANE DOE,          )
his parent                      )
                    Plaintiffs, )
                                )
        v.                      )    CIVIL ACTION
                                )    NO. 09-11118-WGY
MARLBOROUGH PUBLIC SCHOOLS,     )
                                )
                  Defendant.    )
─────────────────────────────────
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                      June 30, 2010

## I.   INTRODUCTION

John Doe (the "Student") is a student with a learning
disability.  After the Marlborough Public Schools ("Marlborough")
deemed him eligible to graduate in June 2007, it discontinued its
services to the Student.  Jane Doe (the "Parent"), believing that
the Student was improperly graduated, unilaterally placed him at
Chapel Haven School ("Chapel Haven").  The Parent sought
reimbursement of private school tuition from Marlborough on the
ground that it failed to provide the Student with a Free
Appropriate Public Education ("FAPE") as required by the
Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §
1400 et seq.  The impartial hearing officer of the Bureau of
Special Education Appeals ("BSEA") held that Marlborough had
improperly discontinued services to the Student, was required to
provide appropriate services retrospectively, and that the Parent

was not entitled to reimbursement for Chapel Haven tuition because unilateral placement was not appropriate.

The plaintiffs and Marlborough both moved for summary judgment challenging different aspects of the hearing officer's decision (the "Decision").  The Parent and the Student ask the Court to uphold that part of the Decision stating that Marlborough improperly discontinued services to the Student, and to reverse the refusal to reimburse the Parent for Chapel Haven tuition.  Marlborough, to the contrary, asks the Court to reverse that part of the Decision concerning improper graduation and to uphold the part denying reimbursement.

## II.  BACKGROUND

The Student was 19 years old at the time of the hearing and lived in Marlborough with his family.  A.R. I at 462.[1]  He had received special education services since elementary school based on significant language-based learning disabilities, attention deficit hyperactivity disorder, and difficulties with executive functioning, auditory processing, social and emotional functioning, and behavior.  Id.  In January 2007, the Student was diagnosed with a chromosomal disorder that is associated with his learning disabilities and his emotional and behavioral problems. Id.  Since April 2003, the Student had been placed at Dearborn Academy, a private, approved special education day school in Arlington.  Id. at 463.

---

[1] AR I, II, or III at # refers to the corresponding page number of the administrative record volumes 1, 2, or 3.

In June 2006, Marlborough (which became financially responsible for the Student's education in July 2006) prepared an individualized education program ("IEP") for the Student for 2006-2007, proposing his continued placement at Dearborn.   The Parent accepted the IEP.   Id. at 463-64.   The IEP which included career education and transition planning services, also stated that the Student "was working towards meeting the graduation requirements of the class of 2008."   Id. at 464.   The Student attended eleventh grade at Dearborn during the 2006-2007 school year and made progress towards all of his IEP goals.   Id.

In February 2007, Marlborough referred the Student to the Massachusetts Rehabilitation Commission (the "Commission") for transitional services, so that the Commission would provide adult services to the Student after he was no longer eligible for special education services.   Id. at 465.

In March 2007, the Student took the Massachusetts Comprehensive Assessment System ("MCAS") exams in English and Math, and passed both exams.   Id. at 465.   During these exams, the Student received numerous accommodations because of his disabilities including a proctor.   Id. at 475.   The proctor testified at the BSEA hearing that she wrote down the Student's dictated responses to the English questions exactly as stated by the Student.   Id. at 475-76.   The proctor denied providing any inappropriate assistance or accommodations to the Student.   Id. at 476.   The Student and his mother testified that the proctor

did not do an exact transcribing of the Student's responses to questions, but instead changed some of his responses. Id.

In June 2007, at the end of the Student's eleventh grade year, his IEP Team[2] developed an IEP calling for his continued placement at Dearborn and providing for continuing services in career education and transition services. Id. at 465-66. The IEP noted the Student's significant progress academically, socially, and behaviorally during his junior year. Id. at 465. At the meeting, the IEP Team recognized that the Student was working toward graduation in June 2008. Id. at 466. In August 2007, Marlborough referred the Student for a vocational assessment, as discussed in the IEP meeting. Id. at 467.

During the Student's eleventh-grade year, his mother identified Chapel Haven, a private residential program in New Haven, Connecticut, as a suitable next step for the Student after he completed Dearborn. Id. at 470. At the IEP Team meeting in June 2007, the Student's mother informed the IEP Team that she wanted the Student to attend Chapel Haven after finishing Dearborn. Id. at 466. During the summer or early fall of 2007, the Student applied for admission to Chapel Haven for the summer of 2008 and for the 2008-2009 school year. Id. at 471. In November 2007, Chapel Haven offered the Student admission into its two-year residential program. Id. at 472.

---

[2] The parties did not specify the exact members of the IEP Team, however, an IEP Team is usually composed of the parents of a child with a disability, not less than 1 regular education teacher of such child and a representative of the local educational agency. See 20 U.S.C.A. § 1414(d)(1)(B).

During his senior year at Dearborn, the Student made good progress, but also had significant behavioral problems and was one of the more significantly disabled students at Dearborn.  Id. at 469-70.  In February 2008, the Parent met with special education officials from Marlborough, and told them that she felt that the Student should attend Chapel Haven after leaving Dearborn, in order to live away from home and become independent. Id. at 472.  She informed the school officials that she would be refusing the Student's diploma.  Id.  One of the officials advised the Parent that the Student would graduate in June 2008, at which time Marlborough's responsibility for his education would end, and that Marlborough would not fund an out-of-state private placement for the Student.  Id. at 472-73.  In a letter dated April 16, 2008, the Parent informed Marlborough that the Student would not be accepting a diploma in June 2008.  Id. at 473.

The Student completed Dearborn in June 2008.  Id. Marlborough did not contact the Parent or take any further action after the Student completed Dearborn and did not contact the Parent in response to her notification that the Student would refuse his diploma.  Id. at 473.

In July 2008, the Student began attending Chapel Haven.  Id. He attended Chapel Haven until December 2008 but did not return after the holiday break because the Parent was no longer able to pay the tuition.  Id. at 474.

5

In October 2008, the Parent filed a request for a hearing at the BSEA, seeking an order finding that Marlborough had incorrectly ended the Student's special education services in June 2008; an order directing Marlborough to reimburse her for the costs of Student's tuition at Chapel Haven; and an order directing Marlborough prospectively to fund the Student's placement at Chapel Haven. Id. at 459.  The Parent later filed an amended hearing request, adding allegations that the Student had not met the criteria for graduation because he received improper accommodations or assistance from Dearborn when he took the MCAS exam in March 2007.  Id.

In March 2009, the BSEA issued a stay-put order, directing Marlborough to offer the Student day services, equivalent to those he was receiving under his IEP at the time he left Dearborn in June 2008, in a public or private day school setting, for a period of time equal to the period from the date of the Student's termination from Dearborn to the date of the BSEA decision.  Id. at 456.

After the three-day hearing, the hearing officer held first, that the Student had fulfilled Dearborn's course requirements for high school graduation and that he had passed the MCAS exam without improper assistance from his proctor.  Id. at 477-78. The hearing officer also held that Marlborough had provided the Student with adequate transition services as required by IDEA. Id. at 478-79.  The hearing officer went on to decide, however, that the Student had not made sufficient progress on meeting his

IEP goals and therefore that Marlborough should not have
terminated his special education services.  Id. at 480-81.
Specifically, she held that "the degree of the Student's
continued unmet deficits" in the areas of emotional control,
executive functioning and time management, communication,
navigating social situations, and functional academics, as well
as his continuing "need for a significant amount of specialized
instruction and support" in addressing those areas, "tip the
balance in favor of a determination that he should not have
graduated, and was entitled to continued eligibility for special
education services to address his areas of weakness, after June
2008." Id. at 480.  The hearing officer therefore ordered
Marlborough to provide special education services to the Student,
retroactive to the date of termination of services to him.  Id.
at 481.

    The hearing officer further held that Marlborough was not
required to reimburse the Parent for the cost of her unilateral
placement of the Student at Chapel Haven, nor was Marlborough
required to provide funding for Chapel Haven prospectively.  Id.
She found that the evidence "does not support a finding that the
Student needs a residential placement to receive FAPE," as he had
made "effective progress in Dearborn, a day program." Id.  The
hearing officer accordingly ordered Marlborough to conduct any
assessments necessary "for an updated picture of the Student's
current skills and needs" and convene an IEP Team meeting to
develop an IEP responsive to the Student's current needs.  Id.

In July 2009, Marlborough filed an action in federal court
under IDEA, seeking judicial review of the Decision.  Marlborough
Public Schools v. John Doe and BSEA, No. 09-11149-RWZ (D. Mass.).
Days earlier, the Student and the Parent had filed an action
seeking affirmance of that portion of the Decision requiring
Marlborough to provide services after June 2008, as well as
seeking reimbursement from Marlborough for the cost of placement
of the Student at Chapel Haven.  Lisa R. v. Marlborough Public
Schools, No. 09-11118-WGY (D. Mass.).  This Court issued an Order
on September 9, 2009, consolidating the two cases and directing
that all pleadings be filed in the lead case, No. 09-11118-WGY.
Thereafter, both Marlborough and the plaintiffs filed motions for
summary judgment, challenging different aspects of the hearing
officer's Decision.

## III. ANALYSIS

### A.   Legal Standard

Federal courts reviewing administrative determinations under
the IDEA employ "an intermediate standard of review" which
"requires a more critical appraisal of the agency determination
than clear-error review entails, but which, nevertheless, falls
well short of complete de novo review."  Lenn v. Portland Sch.
Comm., 998 F.2d 1083, 1086 (1st Cir. 1993).  Federal courts
reviewing administrative decisions must give "due weight" to the
administrative findings of fact, mindful that the judiciary
generally lacks the specialized knowledge and experience
necessary to resolve persistent and difficult questions of

educational policy.  <u>Burlington</u> v. <u>Dept. of Educ.</u>, 736 F.2d 773, 792 (1st Cir. 1984).  Although this Court must engage in an independent review of the administrative record and make a determination based on a "preponderance of the evidence," the Supreme Court has cautioned that such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  <u>Board of Educ.</u> v. <u>Rowley</u>, 458 U.S. 176, 206 (1982).

### B.   Marlborough's Termination of Services

The hearing officer held that although the Student qualified for graduation by passing the MCAS and fulfilling local graduation requirements, Marlborough's termination of services violated the Student's right to FAPE because the Student had not made sufficient progress towards his IEP goals.  AR I at 478-80. Analyzing the matter, the hearing officer answered two separate questions: (1) whether the Student was eligible for graduation, and, if so, (2) whether Marlborough's termination of services nevertheless deprived the Student of FAPE.  To each question the hearing officer gave an affirmative answer.  The parties dispute both conclusions.  The Student and the Parent claim that the Student did not qualify for graduation because he did not validly pass the MCAS exam.  Marlborough argues that the hearing officer should not have looked beyond graduation requirements and, in any event, the Student made sufficient progress on his IEP goals considering his limited capacity and thus, was not deprived of FAPE.

9

1.   Whether the Student was eligible for graduation

Under Massachusetts law, a student (whether disabled or not) must meet two conditions in order to graduate from high school: (1) the student must pass the MCAS test, and (2) the student must meet local requirements for graduation.  Mass. Gen. Laws c. 69, § 1D(i).

All parties agree that the Student fulfilled Dearborn graduation requirements.  The Student and the Parent claim that the Student received improper assistance during his MCAS exam and therefore never validly passed it.

The Student passed the MCAS in English and Math in March 2007. A.R. I at 465.  The Student and the Parent testified that the proctor assigned to transcribe the Student's answers changed some of the Student's responses.  Id. at 476.  The proctor testified that she wrote down his dictated responses exactly as stated by the Student and denied providing any inappropriate assistance or accommodations to the Student.  Id.  The hearing officer held that because the Student's testimony was uncorroborated and undermined by several other witnesses' testimony and by documents showing that his disabilities contributed to his being an unreliable reporter of two-year old events, the Student failed to prove that improper assistance took place.  Id. at 478.  Review of the administrative record including the testimony of the Student, proctor, and a Deaborn employee who oversaw the exam, convinces this Court that the hearing officer's determination was correct.

10

Therefore, the Student properly passed the MCAS exam and was eligible for graduation in June 2008.

### 2.   Whether Marlborough's termination of services deprived the Student of FAPE

The next question is whether Marlborough's termination of services was inappropriate despite the Student's eligibility for graduation.  The hearing officer determined that the Student was deprived of FAPE when Marlborough deemed him eligible for graduation and terminated its services.  She analyzed two factors: (1) whether the Student received adequate transition services (not in dispute here) and (2) whether he made sufficient progress towards his IEP goals.  The hearing officer held that the Student did not make sufficient progress towards his IEP goals and concluded that Marlborough's termination of services deprived him of FAPE.

First, Marlborough argues that as long as the Student became eligible for graduation, as was found by the hearing officer, he properly could be graduated by Marlborough, and no further inquiries should be made.  Second, it argues that the Student was provided with FAPE because he did make sufficient progress towards his IEP and, even if he did not, his IEP was reasonably calculated to provide him with educational benefit.

A student who has attained a high school diploma is no longer eligible for special education services.  See Mass. Gen. Laws c. 71B, § 1 (defining a "school age child" as one without a high school diploma).  Massachusetts law is clear and requires for graduation only the two requirements discussed above.  Thus,

11

Marlborough argues that as soon as the Student fulfilled those two requirements and thus became eligible for graduation, he was no longer eligible for special educational services under IDEA. To support its proposition that a student who meets the standards for graduation necessarily graduates, Marlborough cites Administrative Advisory SPED 2002-4, revised, <u>available at</u> http://www.doe.mass.edu/sped/advisories/02_4.html.

Contrary to Marlborough's view, however, nothing in the Massachusetts laws indicates that an eligible student **must** be graduated.  Rather, eligibility requirements are set as prerequisites.  When faced with this problem, courts have taken the position that notwithstanding a student's satisfaction of local graduation requirements, a school district may not properly graduate a student with disabilities if the student was not provided with FAPE as required by IDEA (e.g., a student did not receive appropriate transitional services or his IEP was not reasonably calculated to provide him educational benefit).  <u>See</u> <u>e.g.</u>, <u>Bell</u> v. <u>Bd. of Educ. of the Albuquerque Pub. Sch.</u>, No. 06-1137, 2008 WL 5991062, at *33 (D.N.M. Nov. 28, 2008) (ruling that even though a student satisfactorily completed graduation requirements, he was deprived of FAPE because his IEP was not reasonably calculated to provide him educational benefits); <u>Kevin T.</u> v. <u>Elmhurst Cmty. Sch. Dist. No. 205</u>, No. 01-0005, 2002 WL 433061, at *14-15 (N.D. Ill. March 20, 2002) (providing that where IEP was not reasonably calculated to provide educational benefits to the student and where transitional services were not

provided, it was improper to graduate a student notwithstanding the fact that he met graduation requirements); Chuhran v. Walled Lake Consolidated Sch., 839 F. Supp. 465, 473-74 (E.D. Mich. 1993) (holding that a student was properly graduated only after determining that he had met local graduation requirements, received transitional services, and sufficiently fulfilled his IEP requirements).

The position advanced by Marlborough, that as soon as a disabled student meets local graduation requirements, he graduates and is no longer eligible for special educational services, "would [] create an incentive for school districts to provide diplomas simply as a way of washing their hands of any possible liability." Bell, 2008 WL 5991062, at *34.  This position contradicts the purpose of IDEA to prevent schools from excluding disabled children from receiving an adequate education. Therefore, notwithstanding that the Student met all requirements for graduation, the Court must nevertheless evaluate whether Marlborough deprived him of FAPE under IDEA by graduating him.[3]

---

[3] At the oral hearing the plaintiffs' attorney took the position that even if FAPE was provided to the Student and transition services were adequate, there was a third reason why graduation was inappropriate.  He referred to the hearing officer's determination that the Student at the time of the proposed graduation, was not prepared for independent living and has serious "unmet deficits" in certain areas.  The Court interprets the Decision differently: the hearing officer used the above mentioned factors to establish the violation of the FAPE and not as an independent ground for graduation invalidity.  This Court is aware of no authority supporting the existence of such an independent ground.

In _Rowley_ the Supreme Court set out a two-part test for determining whether there has been compliance with IDEA: (1) "has the State complied with the procedures set forth in [IDEA]" and (2) was the individualized educational program "reasonably calculated to enable the child to receive educational benefits." _Rowley_, 458 U.S. at 206-07.

The parties do not dispute that Marlborough complied with the procedural requirements when it graduated the Student.  In particular, the Parent and the Student were properly notified about the intention to graduate the Student.  In fact, the Parent consented to the 2007-2008 IEP, which listed the Student's graduation as one of the goals.  The Parent stating that she intended to refuse the diploma, also shows that she was notified about the planned graduation.

The second inquiry is whether the IEP developed through IDEA's procedures was "reasonably calculated to enable the child to receive educational benefits." _Rowley_, 458 U.S. at 207.  A school district is not required to furnish "every special service necessary to maximize each handicapped child's potential."  _Id._ at 199.  Rather, a school district fulfills its substantive obligations under IDEA if it provides an IEP that is "likely to produce progress, not regression" and affords the student with an opportunity greater than mere "trivial advancement."  _Walczak_ v. _Fl. Union Free Sch. Dist._, 142 F.3d 119, 130 (2d Cir. 1998).  The burden of proof is on the Student to show by a preponderance of

the evidence that the IEP was inadequate.  20 U.S.C §
1415(i)(2)(C); see also Rowley, 458 U.S. at 206.

The Student and the Parent argue that the Student's IEP was
not reasonably calculated to enable him to receive educational
benefit during his senior year because the Student did not make
sufficient progress towards his IEP goals.  Marlborough first
disputes the conclusion that the Student, in light of his
individual abilities, did not make sufficient progress towards
his IEP goals.

The Student's 2007-2008 IEP, besides general curriculum
areas (academic strategies, written expression, math, remedial
reading), focused on his social and emotional needs,
communication and behavior, and provided for transitional
services.  The IEP separately discussed all of these focus areas,
determined the current level of the Student, and set
particularized measurable goals and services to be provided to
achieve these goals.  The Parent and the Student identified four
areas where the Student made insufficient progress: behavior,
academic strategies, communication and social and emotional
needs.  Behavior and academic strategies were also identified by
the hearing officer as areas where the Student lacked progress.
AR I at 480.

Concerning behavioral goals, the Student's senior year
quarterly reports expressed doubt that he would be able to
fulfill his IEP requirements.  AR III at 915.  Although the
Student was struggling behaviorally throughout the year, he had a

little progress in the fourth quarter. Id. at 914-15.
Concerning his social and emotional goals, the Student was
reported to have substantial problems which led to a termination
hearing in the fourth quarter. Id. at 913. It was, however,
reported that the Student greatly improved in that area during
his last weeks, after the termination hearing. Id. at 913.
Concerning the academic strategy goals, the Student made progress
following class routines, and was able to accept the help of the
Learning Center where he previewed new class materials, thus
greatly helping him later in class. Id. at 917. He made no
progress on the other four objectives within this goal. Id. at
917. In the area of speech, language, and communication, no
progress was measured because the speech language pathologist
resigned from Dearborn in the end of the first quarter and the
school was not able to fill the position until July 2008. Id. at
876, 916. In other areas, such as written expression, math,
remedial reading, and vocational education, the Student made
sufficient progress. He was able to fulfill class requirements,
receiving mostly Cs and Ds as well as several As and Bs. It can
be concluded that the Student made sufficient progress towards
achieving the majority but not all IEP goals. He made some but
limited progress towards his behavioral, social and emotional
needs, and academic strategy goals.

    Educational "levels of progress must be judged with respect
to the potential of the particular child." Lessard v. Wilton
Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 29 (1st Cir. 2008).

In _Lessard_, the court held that progress which was "modest by most standards" was nevertheless "reasonable in the context of [a child's] manifold disabilities and low IQ."   _Id._

In the present situation, the Student was diagnosed with significant language-based learning disabilities, ADHD Klinefelter Syndrome, and difficulties with executive functioning, auditory processing, social and emotional functioning, and behavior.  AR I at 462.  As a result of his disabilities, the Student was impulsive and immature.  _Id._  As described above, the Student's problems were mostly connected with his behavior.  Quarterly reports noted that during his senior year the Student's emotional condition worsened because he was very concerned about his graduation plans and also because his favorite staff member, upon whom the Student relied for support, left Dearborn.  AR III at 873.  Marlborough argues that in light of these heavy behavioral problems, the Student's progress, though limited, was reasonable.  Although this argument has some merit, it can also be said that the progress was too limited, even for this Student, because he was able to do much better during the previous academic year.  Given the difficulty of an evaluation requiring specialized knowledge, the Court gives deference to the hearing officer's determination.  The hearing officer held that the Student failed to achieve two of his eight IEP goals: behavioral and academic strategy.  The Court adopts the hearing officer's determination in these regard.

Next, the Court must answer the question of whether the failure to achieve some of the IEP goals means that IEP was not reasonably calculated to provide the Student with FAPE.  The Parent and the Student advance no explanation regarding why the IEP was defective (e.g., what services were lacking) other than stating that the Student's progress was not sufficient.  The Parent accepted the IEP at the IEP Team meeting and never expressed dissatisfaction with it.  The Student and the Parent cite to "broad consensus among courts that the IDEA's FAPE requirement is not met unless the Student actually makes 'meaningful progress' toward his educational and developmental goals during the course of the year" without citing any particular case.  And this Court is not aware of any.  Their further argument that "under the Massachusetts regulation, the inquiry is whether the student is 'progressing effectively'" is misplaced because that standard is used to determine whether a student qualifies as disabled[4] and has nothing to do with determining whether an IEP is reasonably calculated to provide a student with FAPE.

Absence of progress toward the IEP goals per se does not make an IEP inadequate.  <u>Lessard</u>, 518 F.3d at 29.  "Actual educational progress can (and sometimes will) demonstrate that an

---

[4] Under Massachusetts General Laws chapter 71B, a child qualifies as a child with a disability if he or she is a school age child in a public or non-public school setting who, because of a disability is unable to **progress effectively** in regular education and requires special education services.

IEP provides FAPE." Id. at 18.  It does not work vice versa,
however.  As the First Circuit observed in Lessard, "to impose
the inverse of this rule - that a lack of progress necessarily
betokens an IEP's inadequacy - would contradict the fundamental
concept that '[a]n IEP is a snapshot, not a retrospective.'"  Id.
at 29 (citation omitted).

    Looking at the Student's IEP as "a snapshot, not a
retrospective," it was reasonably calculated to provide the
Student with educational benefit.  First, the Student did made
sufficient progress towards the majority of his IEP goals.
Despite his behavioral problems, he not only advanced through his
senior year, but received many satisfactory and even good and
excellent marks, as well as positive comments from teachers.  AR
III at 872, 885, 898, 912.  When it was created, the Student's
IEP identified his areas of difficulty and included services to
address each of them.  It also included transition services
designed to prepare the Student for independent living.
Furthermore, Marlborough referred the Student to the
Massachusetts Rehabilitation Commission, an agency that helps
qualified adults with job coaching and monitoring expenditures,
and planned that Dearborn staff would help the Student make a
smooth transition there.  More importantly, at the time the IEP
was fomulated, it was based on the IEP from the Student's junior
year, which was very successful.  AR I at 465-66.  Thus, it was
reasonable to conclude that continuing a similar strategy would

allow the school to provide educational benefit for the Student
during his senior year too.

The hearing officer's analysis differs.  She concluded that
Marlborough deprived the Student of FAPE.  She did not, however,
discuss whether the Student's IEP was reasonably calculated to
provide him educational benefit.  As grounds for her decision the
hearing officer cited to "failure to achieve IEP goals," "lack of
preparation to live fully independently," the Student's
"continued unmet deficits," and "need for a significant amount of
specialized instruction and support" in the areas of "executive
functioning and time management, emotional control,
communication, navigating social situations, and functional
academics."  AR I at 480.

Marlborough correctly notes that "unmet deficits" will
present challenges for the Student throughout his life and cannot
be eliminated with additional services from Marlborough.
Furthermore, Marlborough argues that the Student was generally
prepared for independent life as evidenced by the fact that upon
his arrival at Chapel Haven he already had strong life skills
such as keeping his room organized, cooking, apartment
maintenance, meal planing, and grocery shopping.  Id. at 473.
These arguments have merit.  More importantly, however, the
inquiry is not whether the Student was fully prepared for
independent living or whether he continued to have significant
problems in some areas.  All these arguments tend to look at the
**result**, where the correct standard is to look at whether the

20

school, by virtue of a reasonably calculated IEP, made
educational benefit available to the Student.  In other words,
the Decision incorrectly tends to look at the Student's IEP as if
it were a retrospective, not a snapshot.  See Lessard, 518 F.3d
at 29.

The Court takes into account that deference to the hearing
officer's opinion is particularly important when assessing an
IEP's substantive adequacy because administrative agencies have
special expertise in making judgments concerning student
progress.  In the present situation, however, the hearing officer
did not use the correct approach.  For that reason, it is
appropriate for this Court to refuse to follow her determination.
Independent analysis demonstrates that the Student was not
deprived of free and appropriate public education because his IEP
was reasonably calculated to provide him educational benefit.
Thus, Marlborough provided the Student with FAPE and his
graduation was valid.

### C.   Stay Put Provision

The hearing officer held that Marlborough was required to
provide "stay-put" services to the Student in the form of day
services equivalent to those he was receiving at the time he left
Dearborn in June 2008, for a period of time equal to the period
beginning with the date of Student's termination from Dearborn to
and including the date of the BSEA's decision.  AR I at 456.
Marlborough argues that the stay-put provision ought not be
applied in the present situation.

21

The so called "stay-put" provision comes into play when a representative of a disabled child files a complaint against an educational agency.  20 U.S.C § 1415(j).  It compels the educational agency to continue teaching the child at his "then-current educational placement" until the case is resolved.  <u>Id.</u> This device ensures that public schools do not remove handicapped children over parents' objections pending completion of legal proceedings.  <u>See</u> <u>School Comm. Of Burlington</u> v. <u>Dep't of Educ.</u>, 471 U.S. 359, 373 (1985).

The Parent filed a complaint against Marlborough challenging the appropriateness of the Student's graduation in October 2008. Since that time, Marlborough was obligated to continue teaching the Student at his "then-current educational placement."

Graduation qualifies as a change in placement.  <u>Stock</u> v. <u>Mass. Hosp. Sch.</u>, 392 Mass. 205, 210 (1985) ("[G]raduation . . . can hardly be characterized as anything other than a change in placement.").  Therefore, Marlborough could not unilaterally graduate the Student and stop providing him services while the Parent's complaint was pending.

Marlborough argues that the stay-put provision does not apply because in October 2008 the Student has already graduated and was no longer covered by IDEA.  The Student and the Parent note that they never accepted the Student's diploma and disputed the appropriateness of the graduation.

Courts facing this situation have held that the stay-put provision applies when the graduation itself is disputed.  <u>See</u>

e.g., R.Y. v. Hawaii, No. 09-00242, 2010 WL 558552, at *6 n.5 (D. Hawaii Feb. 17, 2010); Tindell v. Evansville-Vanderburgh Sch. Corp., No. 309-00159, 2010 WL 557058, at *3 (S.D. Ind. Feb. 10, 2010); Bell v. Educ. in the Unorganized Territories, No. 00-160, 2000 WL 1855096, at * 5 (D. Me. Oct. 6, 2000); Cronin v. Bd. of Educ. of East Ramapo Cent. Sch. Dist., 689 F. Supp. 197, 202 n.4 (S.D.N.Y. 1988).  This Court finds these decisions persuasive because they are in line with the purpose of the stay-put provision, which is to provide ensure that public schools do not remove disabled children, e.g., through graduation, over parents' objections pending completion of legal proceedings.  See School Comm. of Burlington, 471 U.S. at 373.  Were this Court to accept Marlborough's argument, it "would render the stay-put provision meaningless because the school district could unilaterally graduate handicapped children." Cronin, 689 F. Supp. at 202 n.4.

To support its position that the stay-put provision does not apply, Marlborough relies on cases holding that the stay-put provision does not apply when the student has aged out of IDEA. Hilden v. Lake Oswego Sch. Dist. No. 7J, No. 94-1117, 1994 WL 519032, at *2 (D. Or. Sept. 20, 1994) (holding that because of his age the student was no longer entitled to receive a public special education and the stay-put provision did not apply). Aging out is different, however, because it is usually an undisputed event ending eligibility for IDEA protection.

Graduation, on the other hand, can be disputed, as it is here.[5]
Therefore, it was appropriate to apply the stay-put provision
until the resolution of this dispute to safeguard the interests
of the Student and prevent Marlborough from deciding this dispute
unilaterally.

Since the stay-put provision applied, Marlborough was
obliged to provide the Student the same day school services at
Dearborn that he was receiving before graduation for the period
starting from October 2008, when the claim was filed, until the
resolution of this dispute.  Thus, this Court upholds the hearing
officer's order concerning the stay-put provision.[6]

### D.    Reimbursement for Chapel Haven

The hearing officer rejected the claim for reimbursement and
prospective funding of expenses associated with the unilateral
placement of the Student in Chapel Haven.  The Student and the

---

[5] During oral argument Marlborough also suggested that there
is no real dispute about whether the graduation requirements were
satisfied and therefore, as with aging out, the stay put
provision is not applicable.  Even were this Court inclined to
accept the position that only graduation requirements must be
satisfied for an appropriate graduation, satisfaction of these
requirements was here disputed.  Namely, the Parent and the
Student disputed that the MCAS exam had been validly passed.

[6] According to the representation of Marlborough's counsel
following the Decision, Marlborough offered the Student placement
in a program that closely matched the services provided by
Dearborn, as well as two outside placements, which the Parent and
the Student refused.  At the subsequent Compliance Hearing, the
Parent made clear that she would not accept any services except
from Chapel Haven and the hearing officer established that
Marlborough had complied with its obligation under the stay-put
provision.

Parent disagree with this decision and ask this Court to order such reimbursement.

"[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." <u>School Comm. of Burlington</u> v. <u>Dep't of Educ. of Mass.</u>, 471 U.S. 359, 373-74 (1985).   "They are entitled to reimbursement <u>only</u> if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." <u>Florence County Sch. Dist. Four</u> v. <u>Carter</u>, 510 U.S. 7, 15 (1993).   The parents have the burden of proof on this issue.   <u>Mr. I</u> v. <u>Me. Sch. Admin. Dist. 55</u>, 416 F. Supp. 2d 147, 170 (D. Me. 2006), <u>aff'd</u> 480 F.3d 1 (1st Cir. 2007).

Because the Court holds that Marlborough did not violate IDEA, the reimbursement of the Chapel Haven tuition is denied.

## IV.  CONCLUSION

Accordingly, this Court rules that: (1) Marlborough properly graduated the Student because he validly passed the MCAS exam and his senior year IEP was reasonably calculated to provide him with educational benefit; (2) the stay-put provision was properly applied; and (3) reimbursement of the cost of the Chapel Haven placement is not appropriate.   Judgment will enter so declaring.

SO ORDERED.

/s/ William G. Young

---

WILLIAM G. YOUNG
DISTRICT JUDGE